JS - 6

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Lourdes Castaneda Sanchez and Jose Luis Sanchez, <br><br> Plaintiffs, <br><br> v. <br><br> United States of America, <br><br> Defendant. | CASE No. CV 09-08477-RGK(PLAx) <br><br> **Order and Judgment RE:** <br><br> **Court Trial** |

**I.   INTRODUCTION**

Lourdes Sanchez ("Sanchez") and her brother Jose Sanchez ("Jose") filed suit on November 18, 2009, against Christina Gomez ("Officer Gomez"), who was later substituted with the United States ("Defendant"). Plaintiff alleges a cause of action for negligence against Defendant, and Jose alleges a cause of action for negligent infliction of emotional distress ("NIED") against Defendant.

Trial of this case commenced on February 2, 2011. The present opinion explains the Court's findings of fact and conclusions of law.

**II. FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This opinion serves as the findings of fact and conclusions of law required by Rule 52 of the Federal Rules of Civil Procedure. Any finding of fact that constitutes a conclusion of law is adopted as such, and the converse is true as well.

**A. Findings of Fact**

1. In the early morning of February 16, 2008, Jose parked across the street from Verdugo Hills Convalescent Hospital in Glendale and dropped off Sanchez.
2. Sanchez proceeded to step off the curb, walk a couple of steps, and began running across the street in the marked crosswalk toward the Verdugo Hills Convalescent Hospital.
3. Officer Gomez, while acting in the scope and employment of the United States as an FBI agent, struck Sanchez while she was halfway through the crosswalk.
4. Jose, who was parked next to the crosswalk at the time of impact:
   a. Saw Officer Gomez's headlights approaching Sanchez;
   b. Was not worried for Sanchez's safety when he saw Officer Gomez's vehicle;
   c. Did not see the actual collision, but heard it and knew that Sanchez had been hit; and
   d. Stepped out his vehicle after hearing the collision and saw Sanchez lying on the ground, trembling, and bleeding from the head.
5. Officer Gomez, immediately before she struck Sanchez:
   a. Had trouble seeing because the street and its surroundings were poorly lit;

   b. Failed to see Sanchez until she was about a car's length from the sidewalk;
   c. Saw that Sanchez was wearing dark colored clothing;
   d. Was driving with her headlights on; and
   e. Was traveling approximately 35 miles per hour.
6. There were two pedestrian crossing warning signs — one traffic sign warning of the approaching crosswalk and the other traffic sign identifying the crosswalk.
7. Since the collision:
   a. Sanchez had undergone multiple surgeries and physical therapy, and suffered, among other things: traumatic brain injury, physical and mental deficiencies, and seizures;
   b. Maria Salazar ("Salazar") cared for Sanchez as a Certified Nursing Attendant ("CNA") and has been paid over $250,000 by Sanchez's Counsel ("Sanchez Counsel");
   c. Sanchez has acted visibly frustrated when she could not perform simple tasks like tying her shoes or removing her clothes;
   d. Jose received and paid a lot of different medical bills; and
   e. Jose experienced depression, anxiety, insomnia, and nightmares of Sanchez lying and trembling on the ground or of Sanchez with tubes all over her body; Jose visited the psychologist three or four times for his insomnia.
8. As a result of the collision:
   a. Sanchez has severely limited communicative abilities, limited ambulatory movement, no cognitive ability, no memory of the collision, no ability to form long-term memories, and

           no awareness of her cognitive impairments;

    b.    Sanchez is able to experience present moment sensations and emotion, including pain and frustration;

    c.    Sanchez has a 53 year life expectancy;

    d.    Sanchez will remain in a dependent, "child-like" mental state for the rest of her life and will require 24 hour care, 7 days a week for the rest of her life; and

    e.    Sanchez will require future medical care, which include regular check-ups with doctors, counseling sessions, physical and speech therapy, and shunt adjustments.

9. Sanchez does not need skilled nursing care; either assisted living or around-the-clock, in-home, CNA care at a rate of $15 to $16 per hour is adequate to meet Sanchez's future attendant needs.

10. Proper medical care will substantially reduce Sanchez's need for future extensive surgical care and lower the likelihood of future seizures, medical complications, and resulting physical pain and suffering.

11. Sanchez's future mental pain and suffering is substantially mitigated by her inability to recall anything from the past, look to the future, and recognize her physical and cognitive impairment relative to what she used to have.

4

**B. <u>Conclusions of Law</u>**

**1. *Sanchez's Negligence Claim***

  **a. *Liability***

    **i. Defendant Is Presumed Negligent Under the Doctrine of Negligence Per Se**

Under the doctrine of negligence per se, negligence is presumed if the plaintiff establishes four elements: (1) the defendant violated a statute, ordinance, or regulation of a public entity; (2) the violation proximately caused death or injury to person or property; (3) the death or injury resulted from an occurrence of the nature of which the statute, ordinance, or regulation was designed to prevent; and (4) the person suffering the death or the injury to his person or property was one of the class of persons for whose protection the statute, ordinance, or regulation was adopted. *Galvez v. Frields*, 88 Cal. App. 4th 1410, 1420 (2001). The first two elements are normally questions for the trier of fact and the latter two elements are determined by the court as a matter of law. *Id.*

As to the first two elements, Cal. Veh. Code Section 21950(a) ("Section 21950(a)") states in relevant part, "The driver of a vehicle shall yield the right-of-way to a pedestrian crossing the roadway within any marked crosswalk." Witnesses on both sides testified that Sanchez was halfway through a marked crosswalk when Officer Gomez's vehicle struck her. Moreover, expert witnesses on both sides testified that the collision resulted in, among other things, Sanchez's permanent brain damage, severe mental and physical deficiencies, and need for constant around-the-clock care for the rest of her life. Therefore, the Court finds that (1) Defendant violated Section 21950(a); and (2) the violation proximately caused Sanchez's injury.

1    The third and fourth elements are also satisfied. There is no
2 question the statute was designed to protect pedestrians from death or
3 injury on California's streets and highways. *See* Pedestrian Safety Act
4 of 2000 § 2, 2000 Cal. Legis. Serv. 833 (West 2000). As a pedestrian
5 crossing the road, Sanchez falls within the class of persons for whose
6 protection the statute was adopted.
7    Since all the elements are met, the Court finds a presumption of
8 negligence on the part of Defendant.

### ii. Defendant Fails to Rebut the Presumption of Negligence

11   The presumption of negligence may be rebutted "by proof that the
12 person violating the statute, ordinance, or regulation did what might
13 reasonably be expected of a person of ordinary prudence, acting under
14 similar circumstances, who desired to comply with the law." Cal. Evid.
15 Code § 699(b) (2004).
16   Defendant argues that it is not negligent because Officer Gomez
17 acted reasonably and could not have done anything to avoid the
18 accident. To support this argument, Defendant introduced evidence that
19 the driving condition was dark, the area was poorly lit, Officer Gomez
20 was attentive while driving the speed limit, and Sanchez was wearing
21 dark clothes while crossing the crosswalk. However, the posted speed
22 limit functions only as a suggested speed limit for optimal
23 conditions; drivers may not drive faster than is reasonable, taking
24 into consideration factors such as visibility. See Cal. Veh. Code §
25 22350 (1963). Thus, while evidence indicates that Officer Gomez drove
26 the speed limit, evidence regarding the driving conditions at that
27 time of day suggests that her driving speed may have been unsafe.
28 Moreover, based on the evidence presented during trial, there were two

traffic signs warning of the pedestrian crosswalk — one sign providing warning of the approaching crosswalk and the other sign identifying the crosswalk. There was no evidence that Officer Gomez slowed down to look for pedestrians, despite the two traffic signs. In light of the foregoing, the Court finds Defendant fails to offer adequate proof to rebut the presumption of negligence.

### iii. There Is No Comparative Negligence

California has adopted a "pure" form of comparative negligence. *Li v. Yellow Cab Co.*, 13 Cal. 3d 804, 827 (1975). The pure form of comparative negligence, which apportions liability in direct proportion to fault, is applicable to cases of statutory violations. *See Sagadin v. Ripper*, 175 Cal. App. 3d 1141, 1167-68 (1985).

Defendant suggests that if it is held liable for negligence, some fault of the collision should be apportioned to Sanchez because she violated California Vehicle Section 21950(b)[1] by running in the path of Officer Gomez. Defendant's evidence shows: (1) Sanchez stepped off the curb, took a couple of steps, and started running in the crosswalk; and (2) Jose saw Officer Gomez's vehicle approaching Sanchez, but was not concerned for Sanchez's safety. It is reasonable to expect a prudent and attentive pedestrian to notice a car with its lit headlights coming her way and act appropriately to avoid it. Nonetheless, Defendant's evidence is simply too sparse and insufficient to conclude that Sanchez's actions warrant a finding of comparative liability.

---

[1] California Vehicle Code Section 21950(b) states in relevant part: "This section does not relieve a pedestrian from the duty of using due care for his or her safety. No pedestrian may suddenly leave a curb or other place of safety and walk or run into the path of a vehicle that is so close as to constitute an immediate hazard."

In sum, the Court finds that Defendant is negligent for Officer Gomez's vehicle striking Sanchez and is fully liable for the resulting damages.

### b. *Damages*

#### i. Past Medical and Attendant Care Costs

Sanchez is entitled to recover the reasonable costs of necessary medical and attendant care expenses ("past expenses"). *See* Cal. Civ. Code § 1431.2(b)(1). On its face, the amount Sanchez seeks appears commensurate to the extent and severity of Sanchez's injuries. Unfortunately, Sanchez Counsel failed to properly present evidence relating to Sanchez's past expenses, substantially limiting the amount of damages the Court can legally award.

Court records indicate that defense counsel made repeated requests for past expenses before, during, and after discovery. Despite the fact that the parties were given six months for discovery, Sanchez Counsel did not attempt to provide such evidence until just before trial. Competent evidence of the medical expenses was never introduced because Sanchez Counsel never laid proper foundation for this evidence. During trial, Sanchez Counsel introduced a "Medical Provider and Expense Summary" ("the Document"), which allegedly provided a comprehensive list of Sanchez's past expenses. (Pl's Ex. 95.) Jose, who purportedly paid the medical bills, could not verify either the procedures performed, or his payment of the specific amounts reflected in the Document. On re-cross, Sanchez Counsel inexplicably attempted to rehabilitate Jose's testimony with evidence that Sanchez Counsel showed Jose the Document and told Jose that the items contained in the Document were the medical bills. In light of Sanchez Counsel's failure to properly lay foundation for this

evidence, the Court simply cannot consider the Document as competent evidence for purposes of determining damages.

In addition to the Document, Sanchez Counsel introduced the following: (1) Dr. Mobius's testimony that he billed Sanchez $44,658 for her past shunt adjustments; (2) Dr. Ramin's testimony that he billed Sanchez $12,001 for her past internal medical care; and (3) Salazar's testimony that she was paid over $250,000 for providing CNA care to Sanchez. This evidence amounts to $306,659 in past medical and attendant care expenses.

The Court notes this additional evidence is also problematic. First, Sanchez Counsel, again, failed to establish that Jose actually paid the amounts billed by Drs. Mobius and Ramin. Second, as to the Salazar expense, the evidence indicates only that the amount was paid by Sanchez Counsel. Sanchez Counsel provided no further testimony indicating that Sanchez would ultimately be responsible for repaying the amount expended by Sanchez Counsel. Nonetheless, the Court finds this additional evidence more reliable than the Document. As to the doctors' bills, it is reasonable to presume that the amounts Drs. Mobius and Ramin testified to billing is the amount owed. Jose's testimony that he received and paid a lot of medical bills lends additional credence to such presumption. As to the Salazar payments, it reasonable to presume that the payments were not made gratis, particularly in light of no circumstantial evidence indicating otherwise. Where inferences of competency can be made regarding this additional evidence, no such inference can be made as to the Document.

In light of Sanchez Counsel's missteps, it is impossible for the Court to determine the amount of past expenses Sanchez has actually borne. Sanchez's multiple brain surgeries, hospitalization, and

9

physical therapy sessions suggest that her expenses far exceed the $306,659 testified to by the two doctors and Salazar. Had Sanchez Counsel properly introduced a complete listing of Sanchez's past expenses, the Court would have awarded them accordingly. Unfortunately, the doctor's testimonies, Jose's statement that he paid a lot of bills, and Salazar's testimony are the only evidence this Court can rely on in calculating her past expenses. As previously discussed, the Court recognizes that reliance on these testimonies is barely sufficient grounds to justify any award. However, the Court also recognizes that completely barring Sanchez from any recovery for her substantial past expenses due to the mistakes of her legal counsel defeats the principles of justice and equity. Hence, this Court awards $306,659 in damages to Sanchez for past expenses.

### ii.  Future Medical and Attendant Costs

Both parties agree that Sanchez will require significant future care and 24 hour attendant care, 7 days a week for the rest of her life. However, the parties dispute the level of care required. Both parties submitted separate life-care plans that proposed different amounts of future medical care costs and varying attendant care options.

With respect to Sanchez's future medical care costs, the Court finds that the $1,643,118 contained in Defendant's life-care plan is appropriate and the net discount rate used to calculate this total is proper. Defendant's life-care plan accounts for Sanchez's essential needs during her 53 year life expectancy, including $1,020,855 for professional services, $109,791 for equipment and supplies, $54,931 for labs and diagnostics, $69,955 for medications, $352,934 for

hospitalizations and surgical procedures, and $34,652 for miscellaneous items. (Def's Ex. 239.)

With respect to Sanchez's future attendant care, the parties' life-care plans present three different attendant care options: skilled nursing facility, assisted living facility, and in-home care. Based on the evidence presented in trial, the Court finds: (1) Sanchez does not need skilled nursing care; (2) the reasonable cost of 24 hour in-home care from a CNA is $16 per hour; (3) the present value of in-home care using Defendant's net discount rate and Plaintiff's 53 year life expectancy is $3,746,521; (4) the present cash value of an assisted living facility using the same net discount rate and life expectancy is $3,333,416. Considering this evidence, and taking Sanchez's circumstances into consideration, the Court takes the larger of the two values, i.e., $3,746,521, to provide Sanchez the flexibility of choosing either in-home care or assisted living care.

Based on the foregoing, Sanchez's estimated future medical and attendant care costs total $5,389,639. However, the Court recognizes that calculating the exact future needs of an individual in Sanchez's circumstances is difficult and imprecise. Therefore, to cover any variables that may have been unaccounted for, the Court hedges on the side of caution and awards $5,500,000 in damages to Sanchez for her future medical and attendant care costs.

### iii. Pain and suffering

General damages are awarded as compensation for physical pain, fright, nervousness, grief, anxiety, worry, mortification, shock, humiliation, indignity, embarrassment, apprehension, terror, or ordeal. *Niles v. City of San Rafael,* 42 Cal. App. 3d 230, 244 (1974).

These terms are difficult to translate into monetary loss, and it is up to the trier of fact to resolve. *Id.* A trier of fact may infer that an individual felt pain if the trier of fact knows through common experience that pain follows such an injury. *See Capelouto v. Kaiser Found. Hosps.*, 7 Cal. 3d 889, 894 (1972).

While Sanchez's lack of cognitive ability and retention of memory may mitigate her pain and suffering, they do not bar her from feeling such pain and suffering. *See id*. Therefore, damages for such injury is recoverable. *See id*. Since the collision, Sanchez has had multiple brain surgeries, seizures, and shunt adjustments. Expert witnesses testified that Sanchez felt painful headaches prior to each shunt adjustment. Moreover, based on common experience, it is reasonable to assume that Sanchez experienced substantial pain associated with her various surgeries and process of rehabilitation. In addition, Sanchez's frustration with her inability to tie her shoes and take off her clothes demonstrates a measure of understanding that she has lost her ability to do certain tasks. In light of these circumstances, the Court awards $2,000,000 in damages for Sanchez's past pain and suffering.

Sanchez will also encounter future pain and suffering. She will need regular shunt adjustments to deal with ongoing headaches. Sanchez will remain in a dependent state for the rest of her life. Therefore, to the extent she suffers mental anguish from the loss of her ability to perform basic tasks, such pain will likely continue, as her physical circumstances will not improve significantly. Based on the evidence, however, the bulk of Sanchez's future physical pain should be limited so long as Sanchez receives proper care. Moreover, most of Sanchez's future mental pain is mitigated by the fact that she is

unable to recall anything from the past, look to the future, and fully recognize her cognitive impairment. Given the totality of the circumstances, the Court awards $1,000,000 in damages for Sanchez's future pain and suffering.

For Sanchez's past and future pain and suffering, the Court awards $3,000,000.

In sum, the Court awards Sanchez $8,806,659 in total damages for Defendant's negligence.

### 2. *Jose's NIED Claim*

A plaintiff may recover damages for emotional distress caused by observing the negligently inflicted injury of a third person if the plaintiff: (1) is closely related to the injury victim; (2) is present at the scene of the injury-producing event at the time it occurs and is then aware that is causing injury to the victim; and (3) as a result, suffers serious emotional distress. *Thing v. La Chusa*, 48 Cal. 3d 644, 667-68 (1989).

The first two elements are not at issue. Jose, who is Sanchez's brother, was present at the scene when Officer Gomez's vehicle struck Sanchez. Jose knew that Sanchez had been hit upon hearing the impact and saw Sanchez lying and trembling on the ground immediately after Sanchez had been hit.

As to the third element, evidence indicates that Jose has had nightmares involving Sanchez's lying and trembling on the ground with tubes in her body. Jose also has had trouble sleeping, has seen a psychologist three or four times to address his insomnia, and feels depressed and anxious.

Damages for Jose's emotional distress can be awarded only for injury that directly results from the injury-producing event at the time it occurs. *See id.* at 668. Injury sustained as a result of events occurring after the accident (e.g., surgeries, recovery, etc.), and the hardship involved in caring for Sanchez is not recoverable. *See id.* Based on Jose's testimony, it appears that his emotional distress is mostly the product of caring for Sanchez, not the product of experiencing the collision. Jose explained that his level of depression and anxiety depends on whether Sanchez's condition is improving or not. Jose's nightmares, which were a major cause of his insomnia, had images of Sanchez lying and trembling on the ground, which relates directly to the accident. However, such nightmares also included images of seeing Sanchez with tubes all over her body, which alludes to Sanchez's state after the collision, while she was in the hospital. Moreover, Jose's own testimony indicates that the nightmares, in general, have diminished.

Based on Jose's testimony, Jose's emotional distress directly arising from experiencing Sanchez's collision is less extensive than the emotional distress he has experienced as a result of the aftermath. As a result, the Court awards $20,000 in damages to Jose.

### III. CONCLUSION

Based on the foregoing, the Court grants judgment in favor of Sanchez and Jose. The Court finds in favor of Sanchez and Jose as follows:

1. The Court finds Defendant negligent and fully liable for the injuries sustained by Sanchez as a result of the accident.

14

2. The Court awards Sanchez a total of $8,806,659 in damages; which is the sum of:
   a. $306,659 in damages for her past medical and attendant care expenses;
   b. $5,500,000 in damages for her future medical and attendant care costs
   c. $2,000,000 in damages for her past pain and suffering; and
   d. $1,000,000 in damages for her future pain and suffering.
3. The court awards Jose total of $20,000 in damages for his NIED claim.

**IT IS SO ORDERED.**

**March 23, 2011**
Date

R. Gary Klausner
U.S. District Judge